UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------X
ROBERT RAIA,

                    Plaintiff,                    MEMORANDUM AND DECISION
                                                       CV-04-3535(DRH)

          -against-

ILLINOIS TOOL WORKS, INC.,
D/B/A HOBART CORPORATION,

                    Defendant.
-----------------------------X
A P P E A R A N C E S:

For Plaintiff:
     Frank & Associates, P.C.
     500 Bi-County Blvd. – Suite 112N
     Farmingdale, New York 11735
       By: Neil M. Frank, Esq.
           Robert Jacovetti, Esq.

For Defendant:
     Bressler Amery & Ross, P.C.
     325 Columbia Tpke.
     Florham Park, New Jersey 07962
       By: Jed Marcus, Esq.

HURLEY, Senior District Judge

          Plaintiff Robert Raia ("plaintiff" or "Raia") commenced

suit against his former employer, Illinois Tool Works, Inc.,

d/b/a Hobart Corporation ("defendant" or "Hobart"), under Title

VII of the Civil Rights Act, 42 U.S.C. Section 2000e, and the New

York State Human Rights Law ("NYSHRL"), N.Y. Executive Law

Section 290 et seq., claiming that he was retaliated against for

opposing alleged discriminatory actions taken by defendant

against a former co-worker of plaintiff's.

          The case was tried non-jury before me over the course

of six days with the testimony being completed on August 19,

2009.  At the close of plaintiff's case-in-chief, and again at the close of all the evidence, defendant moved to dismiss plaintiff's amended complaint pursuant to Federal Rule of Civil Procedure 52(c) ("Rule 52(c)").  The Court reserved decision on those applications, ordering the parties to file proposed findings of fact and conclusions of law which was done via their respective submissions in October of 2009.

The purpose of this decision is to provide the Court's findings of fact and conclusions of law pursuant to Rule 52(c).[1]  Before doing so, however, a brief overview of the applicable law shall be provided.

LAW PERTAINING TO CLAIMS OF UNLAWFUL
RETALIATION IN VIOLATION OF TITLE VII
OF THE CIVIL RIGHTS ACT AND THE
NEW YORK STATE HUMAN RIGHTS LAW

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this

---

[1] Plaintiff also commenced an action against defendant based on the same underlying facts as the present action alleging constructive discharge under Civil Action No. 06-4582.  Defendant was granted summary judgment as to that claim by decision entered on December 21, 2007.

subchapter." 42 U.S.C. § 2000e-3(a). The New York State Human
Rights Law also prohibits retaliation for opposition to
discriminatory practices. N.Y. Exec. Law § 290 et seq. The
standards for liability under the NYSHRL are essentially the same
as those under Title VII. See Ferraro v. Kellwood Co., 440 F.3d
96, 99 (2d Cir. 2006).

Typically in a non-jury Title VII employment
discrimination case predicated solely on circumstantial evidence,
the Court would employ the burden shifting analysis first
enunciated in McDonnell Douglas Corporation v. Green, 411 U.S.
792, 802-04 (1973). The purpose of the McDonnell Douglas
framework is to require the employer in the absence of direct
evidence of discrimination to join the fray by proffering non-
discriminatory reasons for its actions if the employee first
makes a prima facie showing of entitlement to relief. Texas
Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-56 (1981).
Here, the defendant employer came forward at trial and explained
its actions with respect to plaintiff's contentions, not only
through cross-examination but also by calling to the stand a
number of the individuals referenced in plaintiff's testimony.
As a result, the Court will bypass the question of whether
plaintiff established a prima facie case, and proceed directly to
the ultimate issue, viz., whether he has proven the elements of
his retaliation claim by a preponderance of the credible

evidence.  To do so, "plaintiff must show that: (1) he engaged in protected activity; (2) defendant was aware of that activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse action."  (Pl.'s Post Trial Mem. and Proposed Conclusions of Law at 2 (citations deleted).)

An "adverse employment action" for purposes of the third element "is not limited to discriminatory actions that affect the terms and conditions of employment."  Thompson v. N. Am. Stainless, L.P., ___ U.S. ___, 131 S. Ct. 863, 868 (2011)(internal quotation marks and citation deleted).  Rather, Title VII's antiretaliation provision prohibits any employer action that "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Kaytor v. Elec. Boat Corp., 609 F.3d 537, 555 (2d Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S.Ct. 1405 (2006)).  And finally as to the applicable law, a failure to prove any one or more of the four elements is fatal to plaintiff's claim.

<u>PARTIES' POSITIONS</u>

A.  <u>Plaintiff's Position</u>

Plaintiff contends that "[d]efendant retaliated against him for opposing alleged discriminatory actions taken by Hobart against its former employee Anthony Garnier" ("Garnier"), a co-

worker of plaintiff of Haitian descent. (Pl.'s Proposed Findings of Fact at 2.) Such retaliation, plaintiff urges, took many forms, including (1) receiving negative performance reviews and unwarranted reprimands; (2) being given a personal development program ("PDP") on January 5, 2002 under which, absent improvement, he could have been discharged; (3) being the subject of a not-so-veiled threat of grievous bodily harm uttered by Glen Smyth ("Smyth"), the service advisor at defendant's Commack branch where plaintiff worked, and by Paul Todoro ("Todoro"), plaintiff's immediate supervisor at that location, immediately after plaintiff was given the PDP on January 5, 2002; (4) defendant failing to provide plaintiff with a performance review or a wage increase for two years; (5) defendant's failure to promptly repair a broken lock on the van door of plaintiff's service van; (6) defendant continuously refusing to provide plaintiff with a new ladder beginning in April 2003 which ultimately led to plaintiff being injured on December 12, 2003, while performing a service call at the Macaroni Grill, and (5) trashing his service van while plaintiff was on a medical leave of absence.

Plaintiff maintains that the subject acts of retaliation were primarily visited upon him by his immediate supervisor, Todoro.

## B. Defendant's Position

Defendant maintains that plaintiff has failed to establish a prima facie case, no less to discharge his ultimate burden of proving his retaliation claim against Hobart by a fair preponderance of the credible evidence in that, inter alia, (1) "until April 2004, he did not properly put [defendant] on notice that he was engaging in a protected activity," (2) "he did not show that he suffered an adverse employment action," and (3) "he did not establish a link between his complaints and the legitimate actions taken by [defendant]."  (See Def.'s Proposed Findings of Fact and Conclusions of Law at 31.)

## FINDINGS OF FACT

Having set forth the elements that plaintiff must prove to prevail on his retaliation claim and the positions of the parties, the next subject to be addressed will be the Court's factual findings.  By way of a preliminary comment, those findings will focus on the third and fourth elements of plaintiff's cause of action, those being whether plaintiff has established that he suffered one or more adverse employment actions and the causal connection between that action or actions and a protected activity.  As to those elements, markedly divergent proof has been presented by the respective parties as to what transpired, thus requiring the Court to make a series of pivotal credibility determinations.  Having done so, I find that

some of the material claims made by plaintiff - such as the purported threat made by Smyth and Todoro on January 5, 2002 - are not credible.  Certain other of his complaints - such as the claimed condition of his service van upon his return from medical leave - while perhaps troubling to plaintiff, do not meet the objective standard necessary to equate the incidents with actionable retaliation by Hobart.  These deficiencies in plaintiff's proof, particularly with respect to his credibility, taint the remainder of his proof to the extent the Court concludes, as explained infra, that he has not, simply put, proven his case.

The Court's Findings of Fact are as follows:

<u>The Parties</u>

Defendant sells and services commercial food equipment used in such facilities as schools, supermarkets and grocery stores (Tr. 472:21-473:9), with its corporate headquarters located in Troy, Ohio. (Tr. 481:21-22.)  It employs service technicians to repair Hobart equipment, usually at customer's premises.  (Tr. 473:12-20.)

Plaintiff began working for Hobart at its regional office in Commack, New York in November 1989 (Tr. 75:18-19), and continued in their employ until he resigned in April, 2005 after accepting a job at Cleanse Tech apparently a few days before. (Tr. 333:6-334:5.)  From 1995 to 2000, plaintiff reported to Jim

Psarudakis ("Psarudakis"), who was then the branch manager.

Performance Evaluations After Todoro
Became Plaintiff's Supervisor; Plaintiff
Being Placed on PDP, and the Purported
January 2002 Threat by Todoro and Smyth

As of May 1, 2000 Todoro replaced Psarudakis as branch manager of the Commack office.

Todoro's first performance evaluation of plaintiff is dated November 21, 2000.  (Def.'s Ex. F.)  Therein, plaintiff's MAJOR STRENGTHS are reported to be

Bob has been a dependable technician.  In the first half of 2000, Bob helped out when man power (sic) was very low.  When present health problems are resolved, (Bob expects to be back to normal the first of the year), I'm sure Bob will continue to be the help he has been in the past.  I sincerely Thank You Bob, for all the good that you do, It is much appreciated.

(Id.)

Plaintiff's DEVELOPMENT NEEDS were identified thusly:

Bob needs to improve the execution of his technical skills.  I do believe that this will positively effect many aspects of his job.  Most notably, calls per day, call back ratio, and first call completion.  I do believe that Bob's potential is above his present performance, and with focused intent, he can achieve that potential.

I also feel that if Bob would take the high road when it comes to his relationship with dispatch, he would see improved results in that area.

(Id.)

A juxtapositioning of Todoro's first performance evaluation of plaintiff done on November 21, 2000 with Psarudakis's last evaluation (Pl.'s Ex. 39) indicates that Todoro viewed plaintiff's performance less favorably than his predecessor. However, the source of that disparity is independent of plaintiff engaging in a protected activity given that his complaints about the perceived improper treatment of Granier did not occur until May of 2001, i.e. six months later. (See Pl.'s Proposed Findings of Fact, under the caption "Plaintiff Engaged In Protected Activity" at 3-5.)[2] Which is to say, plaintiff's statement that "this criticism [contained in the November 21, 2001 performance evaluation] was in retaliation for Plaintiff's support of Granier" is erroneous. (See Pl.'s Proposed Findings of Fact at 6.)

Plaintiff also places considerable stock in pursuing his retaliation claim upon a document entitled "EMPLOYEE RIGHT OF REVIEW LETTER." (Pl.'s Ex. 15.) Via that letter, plaintiff was placed on a "PERSONAL DEVELOPMENT PROGRAM" under which his performance would be monitored every two weeks for a period of

_____

[2] Although plaintiff cites the May 2001 complaint to Todoro as merely an "example" of the type of alleged discriminatory action against Granier that he opposed, he mentions no earlier episodes in his post-trial submissions and the Court is unaware of any evidence of such complaints pre-dating May 2001. (See Def.'s Ex. FF, Pl.'s Response to Def.'s First Set of Interrogatories, at 9 in which plaintiff lists the first date of him "object[ing] to racial harassment of Anthony Garnier" as of "Spring 2001.")

two months.  Absent improvement in the areas designated,
plaintiff faced the prospect of "disciplinary action up to and
including discharge."  (Id.)

Although the EMPLOYEE RIGHT TO REVIEW LETTER states
that a copy of plaintiff's "Performance Appraisal and Personal
Development Program" is attached thereto, Exhibit 15 is devoid of
attachments.  Plaintiff testified that Todoro gave him the PDP in
that condition.  (Tr. 366:18-367:4.)  Smyth who was also present
is reported to have said that plaintiff's "call per day" and
"callback per day" were "greatly below standards" for a "Tech
VI."  (Tr. 367:5-11.)  Todoro supposedly said nothing during the
meeting beyond directing plaintiff to sign the document.  That
direction was met by plaintiff's refusal to do so, coupled with
the comment that he "would like to contact [his] attorney before
[he] signed anything because this is [his] livelihood."  (Tr.
367:16-19.)

Todoro testified that the EMPLOYEE RIGHT TO REVIEW
LETTER was given to plaintiff with the referenced attachments.
(Tr. 505:3-7 (Def.'s J referred to in this transcript excerpt
corresponds to Pl.'s Ex. 15).)  Todoro also testified that he and
Smyth explained in detail to plaintiff why he was being placed on
PDP, with the goal of the process to assist him in addressing his
weaknesses.  (Tr. 720:25-722:22.)  Plaintiff was non-receptive,
and visibly upset by their presentation.  (Id.)

The PDP meeting ended with plaintiff going "to [his] truck" to make a "service call." (Tr. at 179:22-24.) "Glenn and Paul followed [him] out to the truck" (Tr. 180:1-2), thereupon:

> Glenn got to the right of me; he put his foot on mine. Paul got the left of me. And Glenn says, you know, you can hurt at this job. You're dealing with electricity and you're dealing with gears. Then Paul said to me you never know where it is going to come or from where it is going to come from.

(Tr. 180:7-12.)

In response plaintiff said "[n]othing" but felt "devastated." (Tr. 180:13-16.) On cross-examination, plaintiff elaborated concerning the impact of the threat, "I almost dropped dead right there. I . . I . . I was . . literally going out of my mind. My heart was beating." (Tr. 285:17-19.) When asked if the confrontation was "something [he] would never forget," he answered in the affirmative. (Tr. 286:5-7.)

Todoro testified that neither he nor Smyth followed plaintiff to his truck at the conclusion of the PDP meeting nor threatened him. (Tr. 506:5-20.)

The Court recognizes that outrageous comments, including threats of physical harm sadly are not unknown in the workplace. However, I do not believe plaintiff's testimony concerning the threat that was supposedly made by Todoro and

Symth.  Firstly, I found Todoro to be a credible witness.[3]

Moreover, plaintiff's testimony that he would "never forget" the

threat is nigh impossible to square with the fact that he forgot

- assuming, arguendo, the incident occurred - to mention it in

his lengthy and detailed May 24, 2004 submission to the EEOC.

(Tr. 286:2-288:9; Pl.'s Ex. 5.)  Similarly, the threat incident

is not mentioned in Plaintiff's Response to Defendant's First Set

of Interrogatories (Def.'s Ex. FF) although Interrogatories No.

11 specifically asks plaintiff to "[i]dentify each occasion on

which plaintiff was allegedly subjected to a hostile work

environment and/or discrimination and/or harassment."  (Tr.

295:14-296:16.)

        In sum, plaintiff has not established to my

satisfaction that the January 2002 threat incident occurred.

        Having completed my factual findings concerning the

claimed January 5, 2002 threat leveled at plaintiff, attention

will now be refocused on the PDP.  What transpired after its

issuance lends scant support for plaintiff's retaliation claim

even if, arguendo, the only document he received was Exhibit 15

minus any attachments and whether, in fact, Todoro's and Smyth's

assessments of his performance on the job were well grounded or

otherwise.  Had the PDP been part of a process intended to punish

plaintiff for engaging in a protected activity, presumably it

---

[3]  Smyth did not testify at trial.

would have been a gateway leading to his discharge. But such was not the case. In fact, Todoro testified that plaintiff's post-PDP performance improved "[a]cross the board . . . from the previous report . . . to a level where it was an acceptable level for what he had to do." (Tr. 832:6-833:9.) That improvement, and plaintiff's removal from PDP, lasted "for the rest of the time that he was with me," "up to his resignation in April of 2005." (Tr. 833:10-15.) Indeed, plaintiff's June 2002 "CONFIDENTIAL Performance Evaluation" reflects that marked improvement, as well as Todoro's appreciation of efforts by plaintiff underlying his progress. (Def.'s Ex. H.) Plaintiff received a salary increase in June 2002 (Tr. 915:24-916:12), and again in June 2004 (Tr. 918: 8-25).

In sum, and to partially reiterate as to the three subjects comprising this segment of the Findings of Fact, viz. plaintiff's performance evaluations under Todoro, the January 5, 2002 PDP issued to plaintiff, and the purported threat made by Todoro and Smyth on that date:

1) Plaintiff has not established by a preponderance of the credible evidence that his performance evaluations under Todoro were adverse employment actions, or even if, arguendo, they were, that either was of a retaliatory nature. The first such evaluation predates plaintiff engaging in a protected activity and thus could not be retaliatory, and the

latter two evaluations are not out-of-sync with the first;

2) As to the PDP, that has the hallmarks of an adverse employment action. However, the positive events following closely on the heels of its issuance are inconsistent with the notion that its genesis, in whole or in part, is traceable to plaintiff's defense of Granier; and

3) As to Todoro and Smyth supposedly threatening plaintiff in January 2002, that surely - had it occurred - would have been an adverse employment action. But, as noted, plaintiff's proof falls far short of establishing that it did occur.

<u>THE LADDER INCIDENT</u>

Plaintiff testified that "in April of 2003, [he] asked [Todoro] for a ladder." (Tr. 137:13.) Todoro is reported to have replied "you're not getting one out of me." (Tr. 137:15.) That subject, according to plaintiff, resurfaced in December of that year when he asked Todoro for a company purchase order to buy a ladder. (Tr. 138:16-19.) That request, plaintiff states, was also summarily denied. (Tr. 138:21-24.)

Todoro's recollection of what transpired concerning the ladder was different. He testified that plaintiff never asked for a ladder prior to December 2003 (Tr. 532:16-24), and that when the subject was broached in December, he, Todoro, suggested that plaintiff buy one at Home Depot and submit a voucher for

reimbursement.  (Tr. 533:3-7.)  When plaintiff objected to laying
out the money in advance, Todoro told plaintiff "to go to the
front office for a P.O" and to obtain one from the hardware store
on Hobart's account.  (Id.)  That, Todoro believes, plaintiff did
not do.  (Tr. 533:8-14.)

Plaintiff's testimony about the so-called ladder
incident on direct was less than a model of clarity, particularly
with respect to his references to a purchase order.  Todoro's
testimony, on the other hand, was straightforward, succinct, and
made sense.  And as indicated earlier, I found Todoro to be a
believable witness which is a label that I have been unable to
attach to plaintiff as to much of his testimony.  In sum,
plaintiff has not proven that Hobart, acting through Todoro,
denied him access to a ladder in April and/or December of 2003.

### THE TRASHED TRUCK

When plaintiff returned to work on December 6, 2004
from a medical leave of absence, he went to the company van he
used in performing his duties.  Upon opening a door to the van,
he observed that the interior of the vehicle was in disarray
having, according to him, salad dressing on the driver's wheel
and ketchup smeared on the windows and seats.  (Tr. 164:9-14.)
Plaintiff also explained that his personal tools were missing.
(Tr. 164:15-17.)  In an apparent non-sequitur, plaintiff
testified that Todoro assured him that he would not be

responsible for any missing "Hobart . . . parts . . . and tools," to which he replied "I want it in writing." (Tr. 164:19-165:20.)

Although plaintiff's direct testimony on the ownership of the missing tools lacked clarity, he seemed to be insisting that at least some of the missing tools were his personal property which were never found. (Tr. 167:21-23.) Yet on cross-examination he was asked

Q.   . . . and you said that your personal tools had been taken?

A.   Yes.

Q.   In fact were any of your personal tools taken?

A.   Yes.

Q.   In fact didn't you tell me in your deposition that none of your personal tools had been taken?

A.   I would have to look.  I don't recall.

(Tr. 281:3-10.)

At that point, plaintiff was directed to the following excerpts from his deposition:

QUESTION: There were items missing?

ANSWER:   Yes.

. . .

QUESTION: Your personal items?

ANSWER:   No.

(Tr. 282:12-17.)

But more important than the question of who owned the missing tools (which bears primarily on plaintiff's credibility) is the assumption implicitly harbored by plaintiff that defendant necessarily caused the vehicle to be trashed and did so in retaliation for his engaging in protected activity. The trasher's identity and affiliation, if any, is unknown and unknowable from the evidence. Was he a trespassing vandal or a slovenly low-level Hobart employee acting on his own account? In other words, the mere fact that the truck did not meet plaintiff's standards upon his return from medical leave does not mean that the defendant was responsible. Moreover, I note that it is undisputed that plaintiff was given time to clean the truck, and was never charged for any items that may have been damaged or missing.

In sum, the incident has not been shown to be part of the retaliatory conduct plaintiff seeks to attribute to defendant.

THE BROKEN LOCK

Plaintiff testified that in "September 2002," upon returning to his truck from a service call, he discovered that the lock to the back section was broken. (Tr. 111:1-13.) He then called the dispatcher and asked for permission to go "to a locksmith," which permission was denied with the explanation "there's too many calls out there. I can't have you go to a

locksmith." (Tr. 111:17-112:15.) A week later he "told [Todoro] about the lock." (Tr. 113:4-5.) Todoro is reported to have said "You ruined it. You broke it; you live with it." (Tr. 113:8-9.) As a result, plaintiff reported that for the "next year and a half," i.e., until the lock was fixed, he had to crawl in and out of the truck to access his inventory. (Tr. 152:7-9.) The lock remained inoperable until approximately May of 2004. (Tr. 995:11-996:13.)

According to Todoro, the time frame was far shorter. Firstly, Todoro explained that when a company car is damaged, defendant's "fleet management company" handles the matter. (Tr. 840:21-842:3.) In this case, Todoro testified that the vehicle was taken to Alpha Omega Auto Body Shop on April 7, 2004 for an estimate. (Tr. 842:1-24; see also Def.'s Ex. II.) And that was done, Todoro testified, "within several weeks, a week or two" of the time plaintiff advised him of the damaged lock. (Tr. 845:16-846:2.) Todoro then explained that the estimate was submitted to the fleet manager who was thereafter responsible for making sure that the repairs were made. (Tr. 841:14-842:3.)

In sum, I think it is more probable based on the evidence that the rear lock was out of commission from sometime in March 2004 until May 2004 consistent with Todoro's testimony rather than from September 2002 until May 2004 as plaintiff

maintains.[4]

INVESTIGATION BY PHILLIPPI

On April 2, 2004 plaintiff called Vicki Phillippi ("Phillippi"), Hobart's Human Resources Director stationed in Troy, Ohio.  (Tr. 149:4-19.)  He told her "about what happened to Anthony Granier" and complained in broad-strokes about the retaliation to which he, plaintiff, had been subjected for endeavoring to come to Granier's aid.  (Tr. 151:4-5.)  Such retaliation escalated to the point, according to Phillippi, that plaintiff told her "that he feared for his life."  (Tr. 580:2-4.)

Phillippi further testified that plaintiff advised her that "he had witnesses and he had everything written up and had documentation about more specifics."  (Tr. 580:18-20.)  However, plaintiff "did not want to divulge the witnesses or the other information that he had" to her at that time.  (Tr. 581:4-5.) Phillippi's testimony in that regard dovetails with information elicited from plaintiff during cross-examination in which he confirmed that he told Phillippi that he had "notes and what-not, but . . . chose not to give them to her" and that those notes included "the names of people who could corroborate [his testimony regarding] harassment."  (Tr. 307:18-308:4.)  In any

_____

[4]  The Court is aware that plaintiff after repeatedly testifying that the lock was broken for a year and a half or from September 2002 (Tr. 111:1; Tr. 152:7-13; Tr.996:17-18), later testified that the correct date, as given at his deposition, was September 2003, not 2004.  (Tr. 1005:11-15.)

-19-

event, Phillippi wrote a "follow up" letter dated April 12, 2004 to plaintiff referencing their "phone conversation of April 2, 2004." (Pl.'s Ex. 22.) Therein, she wrote:

> In our conversation, you told me that you felt that you were being unfairly treated by managers at the Commack Branch. We will do a thorough investigation of your claims in accordance with our policies against discrimination and harassment. As part of that discussion, you mentioned to me that you had witnesses to the situations you shared with me as well as additional notes on other situations you did not disclose. Unfortunately, you refused to identify who those witnesses are or to give me copies of the notes you claim to have regarding other situations. Under these circumstances, it is extremely difficult to conduct a thorough investigation or to corroborate your story without witnesses or written documents. All of your concerns are important to me and I would like to ask you to reconsider sharing the rest of your notes with me on other situations as well as the names of witnesses I can talk to for each situation so that I may do a thorough investigation.
>
> Also, you should know that under our policies, you cannot and will not be retaliated against because you brought these complaints to our attention. Please let me know if you feel that there have been any acts of retaliation. You should bring these complaints directly to my attention.
>
> Please call me and let me know if you would be willing to share this additional information. I can be reached at 937-332-2929 during the day. If it is not convenient to speak during the day, I would be happy to arrange a time that would be more convenient for you.
>
> Thank you for your assistance.

(Id.)

      The referenced corroborative information was never made available to Phillippi.  Nonetheless, she traveled from Ohio to the Commack branch office on "May 5th [2004] . . . specifically to talk with [plaintiff and to] observe what the climate was firsthand."  (Tr. 585:13-23.)  On that date, she met with plaintiff.  During their meeting, she and plaintiff discussed such subjects as the PDP, his performance on the job, the ladder incident, as well as the broken lock which plaintiff said, incidently, took "a month or a month and a half to get fixed." (Tr. 585:24-587:8.)  Phillippi had already seen his next "performance appraisal" which his supervisor was scheduled to present to him in June.  That appraisal "indicat[ed] he was going to get a raise and his performance were (sic) meeting standards." (Tr. 589:1-2.)  Armed with that information, Phillippi "tr[ied] to put his mind at ease [during their face-to-face meeting by telling him that she] was sure that his manager would be talking to him shortly and that perhaps he should wait to see how that performance appraisal came out before he was concerned about how his performance were being evaluated."  (Tr. 589:5-11.)

      And as part of her investigation, she, before her trip to Commack, inter alia, spoke to Todoro about the ladder incident (Tr. 585:4-5), "check[ed into] the PDP," and advised Hobart's "region director Don Stairs about her ongoing investigation."

-21-

(Tr. 584:9-19.)

Phillippi concluded her investigation by attributing plaintiff's complaints primarily to "a miscommunication between the manager and Mr. Raia." (Tr. 590:21-22.) She suggested that the three of them (i.e. Don Stairs, Todoro and plaintiff) and herself "if [plaintiff] was comfortable with that," get together to discuss plaintiff's concerns. (Tr. 590:19-591:8.) In response, plaintiff said "he might consider it in the future, but not at that time." (Tr. 591:8-9.)

I found Phillippi to be a credible witness and do not accept plaintiff's argument that her investigation was essentially a sham and further evidence of retaliation. To the contrary, the evidence suggests she performed appropriately, particularly considering that her investigation was partially hamstrung by plaintiff's inexplicable lack of cooperation.

### 2002 WARNINGS

Plaintiff claims that he was subject to retaliatory reprimands. In that regard, plaintiff on October 8, 2002, was given a REPORT OF DISCIPLINARY ACTION ("the Report") concerning an incident said to have happened on August 29th at a Dunkin Donuts in Oyster Bay, New York. (Def.'s Ex. M.) According to the Report, plaintiff had been sent to that location to "work on an M-802 Mixer." (Id.) The customer stated that plaintiff had said "I don't fix anybody else's sh*T, I'm not doing [anybody]

else's work." (Id.)  At that point, plaintiff called defendant's dispatcher in an agitated state, and the dispatcher suggested that plaintiff leave Dunkin Donuts.  After he did so, the customer asked that plaintiff be directed to return to complete the service call.  That request was granted.  Upon his return, plaintiff is reported to have said to the customer "are you happy now you bastard, you had to call my office, now it's going to cost you, you wanted me, now you got me." (Id.)  After further exchanges between plaintiff and the customer, someone contacted the dispatcher, leading to another technician being sent to the site to replace plaintiff.

Both Todoro and Stairs spoke to the customer, finding his rendition of what had transpired credible.  The Report further recites that plaintiff stated "that he did not say these things, and that the customer was hostile to him." (Id.)  The Report concludes thusly: "the next time [plaintiff] receives a complaint similar to this one . . . disciplinary action up to including dismissal may be given." Id.

On November 29, 2002 plaintiff was the subject of a verbal reprimand at a meeting attended by himself, Todoro, and Smyth.  The subject of the meeting was plaintiff's purported improper replacement of two steam valves at St. Charles Hospital in Port Jefferson.  The error necessitated Smyth going to the job site and "put[ting] the valves in correctly." (Def.'s Ex. N.)

Labeling the subject task as a "very simple procedure," and thus an unnecessary call back, Todoro said that plaintiff's performance did "not come up to par with a level IV tech." (Id.) The warning concluded with the statement that the "situation will be monitored and if need be further talks or actions will be taken." (Id.)

Both warnings essentially speak for themselves. Whether, with respect to the Dunkin Donuts incident, the customer was "hostile" to the plaintiff or vice versa, and as to the St. Charles hospital episode, whether or not the task was a simple procedure for a tech IV, are not the pivotal issues per se.[5] Instead, the key question is whether the plaintiff has proven either or both of the subject warnings to be retaliatory. That question calls for a negative answer given the evidence adduced at trial.

## CONCLUSION RE FINDINGS OF FACT

The foregoing constitutes the Court's Findings of Fact. Consistent with what was indicated at the outset, I have specifically discussed most, but not all of the plaintiff's catalog of retaliation claims. However, all of his claims have been considered, both individually and inter se.

---

[5] The situation would be otherwise if there was, contrary to the fact, evidence that the accusations, or defendant's response thereto, were trumped-up to punish plaintiff for engaging in protected activities.

At this point attention will be directed to the Court's Conclusions of Law.

CONCLUSIONS OF LAW

As noted earlier, to establish a claim of retaliation, the plaintiff must prove that: 1) he engaged in protected activity; 2) defendant was aware of that activity; 3) he suffered an adverse employment action; and 4) there was a causal connection between the protected activity and the adverse action. Gordon v. New York City Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000).

Plaintiff's failure to establish one or more of the elements requires that judgment be entered for the defendant. Here, Raia has not established by a fair preponderance of the credible evidence the third and/or fourth elements of his retaliation claims.[6] Specifically,

1. The performance evaluations made by Todoro have not been shown to constitute adverse employment actions or, arguendo, even if the situation were otherwise, to be causally related to plaintiff's comments about Granier. The November 2000 evaluation, although claimed by plaintiff to constitute an

---

[6] Parenthetically, defendant stipulated during its opening statement that plaintiff engaged in a protected activity. (Tr. 67:6-8.) As to the second element of the cause of action, defendant contends that it was unaware until April 2004 that plaintiff's objections to Hobart's treatment of Granier were based on what he perceived to be discrimination as distinct from nonactionable rudeness in the workplace.

act of retaliation, clearly is not given that it predates the first protected activity comment cited by plaintiff.  Moreover, the two Todoro evaluations which post-date plaintiff engaging in a protected activity are generally in sync with the November 2000 evaluation, strongly suggesting that they too are untainted by discriminatory animus.  See generally, Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991)("The fact that an employee disagrees with an employer's evaluation of him does not prove pretext"), overruled in part on other grounds by St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

2. Plaintiff being placed on PDP in January 2002 for the first and only time certainly would qualify as an adverse employment action if he demonstrated that (a) "similarly situated" Hobart employees were dealt with less harshly, Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003), and (b) his testimony as to what transpired during the PDP meeting and immediate thereafter was found to be credible.  But his efforts to show disparate treatment fell short of the mark, as did his testimony about what happened on January 5, 2002.  The Court's conclusion as to credibility is based not only of the fact that I believed Todoro's and Stair's testimony, including their explanation as to why plaintiff was placed on PDP, but also because plaintiff's testimony does not ring true.  By way of one example, plaintiff categorized the threat incident as

unforgettable, but he forgot to mention it in his detailed letter to the EEOC and, more importantly, in his answer to defendant's interrogatories.

3.  With respect to the messy truck incident, there is insufficient evidence linking defendant to the claimed substandard condition of the company-owned van upon plaintiff's return from medical leave.  Whether Hobart, as distinct from, e.g., a disgruntled fellow employee acting pursuant to his own agenda or a interloping vandal, caused the mess is problematic. Simply mentioning that defendant had the keys to the truck, standing alone, does not cure that deficiency.  Moreover, it is undisputed that Todoro provided plaintiff with adequate time to clean the truck and assured him that under no circumstances would he be held responsible for any equipment missing from the vehicle.  Such accommodations run counter to the notion that this incident constituted retaliation by defendant.  Which is to say, plaintiff has not established the third or fourth element vis-a-vis the messy truck.

4.  With respect to the broken lock to plaintiff's assigned truck, the credible evidence indicates the necessary repair was probably done closer to several weeks after the damage occurred, rather than a year and a half later as plaintiff testified.  As to this incident, plaintiff again has failed to establish either the third or fourth element of his retaliation

claim.

5. As to Hobart's investigation of plaintiff's complaints following his phone call to Phillippi in April of 2004, the credible evidence fails to support his claim that Phillippi's efforts constituted retaliation, or were a ruse to mask retaliation by other wrongdoers acting on defendant's behalf. Once again, the third and fourth elements remain unproven.

6. The 2002 warnings and/or admonitions given to plaintiff have not been shown to be retaliatory in nature. No effort was made at trial by plaintiff - who, of course, has the burden of proof - to corroborate his less-than-vigorous denials of the underlying events at Dunkin Donuts and at St. Charles Hospital said by defendant to have triggered the warnings. That defendant responded to, and evaluated the customer's complaints, followed by what the company concluded was an appropriate warning to Raia may not, on the evidence at hand, be equated with an adverse employment action. An employer has a right to monitor, and correct when necessary, its employees' shortcomings in performing their jobs. See generally Dotson v. City of Syracuse, No. 5:04-CV-1388, 2009 WL 2176127, at *18 (N.D.N.Y. July 21, 2009)("The law in this circuit, post-White, is clear that an employer's excessive scrutiny of an employee, without more, fails to satisfy the requirements for an adverse employment action.

Moreover, reprimands that do not lead to materially adverse employment consequences are generally not considered actionable forms of retaliation.")(internal citation omitted); Constance v. Pepsi Bottling Co. of N.Y., No. 03-CV-5009, 2007 WL 2460688, at *36 n.15 (E.D.N.Y. Aug. 24, 2007)(expressing doubt, in light of Burlington Northern standard, that "surveillance on the job" would constitute an adverse employment action); Meder v. City of New York, No. 05-CV-919, 2007 WL 1231626, at *4 (E.D.N.Y. Apr. 27, 2007)(finding "excessive scrutiny" does not constitute adverse employment action); Scott v. Cellco P'ship, No. Civ. 7245, 2007 WL 1051687, at *2 (S.D.N.Y. Apr. 3, 2007)("As to plaintiff's assertions of 'defendant's general reprimands about plaintiff's lateness and other accusations, and alleged excessive scrutiny of plaintiff' . . . the Court concludes that those allegations, if true,[7] do not constitute adverse employment actions as now defined in Burlington").

6. In sum, plaintiff has not proven by a preponderance of the credible evidence that he sustained one or more adverse employment actions at the hands of Hobart, or that, arguendo, even if he did, that those actions were attributable in whole or in part, to Hobart retaliating against him for engaging

---

[7] Here, the record is devoid of credible evidence suggesting that the Dunkin Donuts and St. Charles' complaints were fabrications or that Hobart's responses were inappropriate as discriminatory or otherwise.

in a protected activity.

Defendant moved for judgment as a matter of law pursuant to Rule 58(c) at the conclusion of plaintiff's case-in-chief, and again at the conclusion of all the evidence.  Given that plaintiff has failed to meet his ultimate burden of establishing that he was the victim of discrimination under Federal or State law, defendant's Rule 58(c) motion is rendered academic and, accordingly, will not be further discussed.

CONCLUSION

The above constitutes the Court's Findings of Fact and Conclusions of Law.  For the reasons indicated, judgment is awarded to defendant and the Clerk of the Court is directed to enter judgment in its favor.

SO ORDERED.

Dated: August 5, 2011
       Central Islip, New York

                              /s/_____
                              DENIS R. HURLEY, U.S.D.J.